884 F.2d 1387
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
DAVIDSON MINING INC., Petitioner,
v.
FEDERAL MINE SAFETY & HEALTH ADMINISTRATION; Federal Mine
Safety and Health Review Commission, Respondents.
 No. 88-1136.
 United States Court of Appeals, Fourth Circuit.
 Argued April 12, 1989.
Decided Aug. 28, 1989.
 
 Anthony Joseph Cicconi (Shaffer & Shaffer on brief) for petitioner.
 Carl Charles Charneski (George R. Salem, Solicitor of Labor, Edward P. Clair, Associate Solicitor, Dennis D. Clark, Counsel, Appellate Litigation, United States Department of Labor on brief) for respondent.
 Before WILKINSON, Circuit Judge, and HAYNSWORTH and BUTZNER, Senior Circuit Judges.
 PER CURIAM:
 
 
 1
 Davidson Mining seeks review of an order of the Federal Mine Safety and Health Review Commission upholding the imposition of penalties for safety violations. Davidson Mining disputes the fact findings of the Administrative Law Judge that became those of the Commission when a petition for discretionary review was denied. We are required to uphold those findings when there is substantial evidence to support them. We think there was such supporting evidence.
 
 
 2
 The Federal Mine Safety and Health Act of 1977, 30 U.S.C.A. Secs. 801-78 (1986) requires the operator of a deep coal mine to provide forced air ventilation for each working face to carry away dust and gases released in the working process. Typically, that is accomplished by providing one or more tunnels through which air is forced mechanically and one or more tunnels through which ventilation air is exhausted. This system of ventilating tunnels is intersected at intervals by crosscut tunnels. As each working face advances and new crosscut tunnels are constructed, older crosscut tunnels must be sealed off. Otherwise, ventilating air would tend to take the first crosscut tunnel to the exhaust tunnel and fail to provide the necessary ventilation for the working face of the coal seam. The more recent crosscut tunnels are usually sealed with heavy, hanging curtains through which men and equipment may pass but that prevent the passage of substantial quantities of ventilating air. More permanent seals are provided for older crosscut tunnels.
 
 
 3
 The Moose Mains portion of Davidson's # 1 Mine in Boone County, West Virginia contains two sections, the 006 section or left section, and the 007 section or right section. Each of those sections has its own independent ventilation system, but air may be diverted from one section to the other.
 
 
 4
 There was an "unintentional roof fall" in the right section at approximately 2 o'clock in the morning on Saturday, November 28, 1987. The roof fall disrupted the flow of ventilating air.
 
 
 5
 On Tuesday, December 1, 1987, Ernest Thompson, an MSHA inspector, conducted a general inspection. Coal production was suspended in the right section. He determined that the air flow in the last open crosscut was 5,490 CFM, although a minimum of 9,000 CFM is required. The mine foreman responded by repairing and adjusting check curtains and by 11:05 A.M. on December 1 the air flow in the last open crosscut had been restored to an acceptable 9,250 CFM. An hour and thirty-five minutes later, however, Thompson found the air flow in the last open crosscut to be back down to 2,420 CFM. Thompson informed the foreman that he was going to issue a citation. On the surface, Thompson completed the written citation form that required an abatement of the ventilation deficiency by 2 P.M. This written citation was handed to Davidson's chief electrician at approximately 2 P.M. Thompson's act emphasized his belief that the hanging of temporary curtains in the vicinity of the roof fall and the adjustment and tightening of other curtains at the crosscut, as had been done earlier that morning, would provide a satisfactory temporary solution. This was disputed by Davidson's people. The mine superintendent testified that the tightening and adjustment of curtains in the crosscut earlier that morning only exacerbated the weak point at the site of the roof fall; he thought that temporary curtains could not be installed in the vicinity of the roof fall without requiring men to work beneath unsupported roof, and that was forbidden.
 
 
 6
 In addition to the disagreement about the feasibility of temporary solutions, there was initial disagreement about a permanent solution. In response to Thompson's inquiry he was informed that Davidson planned to build "stoppages" in the area of the roof fall. That would involve the construction of cinder block walls extending from floor to ceiling, and Thompson suggested as an alternative that "an undercast" be constructed. The Davidson people thought that suggestion a good one and readily accepted it.
 
 
 7
 Inspector Thompson returned to the mine the next day, December 2, 1987. He arrived at approximately 11 o'clock in the morning, when the air flow in the last crosscut tunnel was measured as 6,042 CFM. Nevertheless, the report from the preceding evening indicated that mining had been conducted after 8 P.M. That coal had been extracted on the right side was obvious to the inspector, for the working face had been advanced and a conveyor had been moved to a point where access to it was unimpeded by the roof fall.
 
 
 8
 The statute requires that certain safety conditions be surveyed before each shift, and reports of those surveys, signed by each incoming shift foreman, must be maintained by the miner.
 
 
 9
 Those reports indicate that the air flow in the last crosscut tunnel at 3:30 P.M. on December 1 was 3,010 CFM. There is a space on those reports for recording any corrective action taken, but there is no notation of anything done that day. Nevertheless, it is undisputed that mining did recommence on the right side after 8 P.M. The next one of these reports is labelled "10:00," but with no indication of whether it was taken in the morning or afternoon, and recorded air flow in the last open crosscut tunnel as being 9,040 CFM.
 
 
 10
 When Inspector Thompson observed the advance of the mine face and the relocation of the conveyor belt and measured the air flow in the last open crosscut tunnel as being well below the minimum, he immediately issued a withdrawal order. The mine safety director sought an extension of time stating that the undercast would be completed within a few hours. His request was denied, but the undercast was soon completed and normal flow of ventilating air restored. Thereupon, Thompson terminated the withdrawal order that had been in effect for approximately three and one-half hours.
 
 
 11
 There are two branches to this factual dispute, both of which were resolved against Davidson.
 
 
 12
 Inspector Thompson thought that coal had been mined on the right side on November 29 and 30, after the roof fall, with inadequate ventilation. That mining occurred seems undisputed. Davidson contends, however, that ventilation was adequate until 10 P.M. on November 30 when air flow in the last open crosscut was read as being only 3,100 CFM. Davidson insists that it did no mining when there was a deficiency of ventilating air, and the reported readings tend to support its contention that the actual circulation was sufficient.
 
 
 13
 Davidson claims that on the evening of December 1 it closed down operations on the left side and redirected air to the right side, providing sufficient ventilation for the mining it was conducting for the relocation of the conveyor belt. The Government does not directly dispute the claim that operations on the left side were suspended on the evening of December 1, and one cannot readily find a reason for a suspension of those operations unless it was for the purpose of diverting ventilating air to the right side. Nevertheless, those written reports give no inkling of the claimed occurrence. The report dated "10:00" without any indication that it was in the morning or the afternoon would tend to show adequate ventilation at the time the reading was taken and that reading was likely taken in the evening, but the report itself is not conclusive.
 
 
 14
 Each side can find some support for its factual contentions, but the first question for us is "Who is to say?" We are appellate judges and, clearly, not fact finders. We may reject findings based upon suspicion and surmise, but the fact finder is entitled to draw reasonable inference from available data. When the available data permit more than one reasonable inference, the choice is that of the fact finder.
 
 
 15
 We cannot say that the fact finder in the process here went askew. Considering the whole record, there is substantial evidence to support the findings of fact, and we accept them.
 
 
 16
 AFFIRMED.